We have four cases on the calendar this morning. Two employee cases, one from an arbitrator and one from the board. The bid protest case from the claims court and the patent case from the PTAB. The MSPB case will not be argued, it's being submitted on the briefs and we will hear two cases. First the claims case, a little out of order, and then the arbitrator case, and then we will briefly adjourn for a few minutes and then return with a slightly modified panel, no less distinguished. The first case is AFGE Local 1923 versus the Social First case is Electra-Med versus the United States 19, 2019-12-66, Mr. Krucius. Thank you, Your Honor. I am prepared to argue this case. Before you begin, Mr. Krucius, I'd like to ask you a question about the opinion in this case originally was issued under seal and then was released. All of the briefs in the case are not more confidential than the appendix is. Is there anything in the appendix that is still confidential or was that just, are we restricted, do you know? Not that I'm aware of, Your Honors. I think the main thing that was restricted in the appendix were the affidavits filed by the plaintiffs, but those aren't really at issue in this case. I don't think they will be at all. So I don't anticipate. Do you know whether your co-counsel would take the same position? I agree with you, Mr. Krucius. There's nothing previous. How about the government? We agree, Your Honor, there's nothing. Okay, thank you very much. I just didn't want to be restricted when it comes down to writing the opinions. I appreciate that, Your Honor. Thank you. Mr. Woodard, do you want to reset it at 15? That shouldn't count on this one. Thank you. Please proceed. Good morning, Your Honors. May it please the Court. My name is Eric Krucius. I'm here from Holland and Knight for the appellants. With me at the table is Greg Hallmark and David Black, also from Holland and Knight. We're here asking the Court, this Court, to reverse the quarter-final claims motion. Could I understand what's going on here? As I understand it, these master agreements or whatever, I want to call them, expire in six months, is that right? As they stand right now, under the current J&A, they expire. Specific date? What's the date? I believe it's April of 2020. And the supply contracts that the distributors have entered into, do those go beyond that six-month period? I believe they end right at that six-month period as well. Okay, so it seems to me a little difficult for the government to do anything to come into compliance with the statute in a six-month period. What do you understand is the situation with respect to new agreements that would come into effect after the six-month period is over with? Well, as I understand right now, the government has issued new solicitations for a new MSPB program that they call MSPB 2.0. In fact, they just issued an updated, they had withdrawn a solicitation that they had issued last month. They reissued it in late, I think last week sometime. And the expectation is that they would carry on with that solicitation. Is it your view that the new solicitation complies with the law or not? I think it's a lot more compliant with the law. I think in a lot of respects, it gives the power back. It allows the government to do as they had before. I've looked at it pretty closely and it's not entirely clear whether the government would have to comply with the Rule 2, but that bond between the government and those SBOSBs that allowed them to contract together with each other, it would be back again. And I think that would bring in all those requirements that were in our complaint that we were worried about that would be washed away. That being said, there's nothing that has committed the government to carrying out that new solicitation. They can carry on with these solicitations. As you know, the government can withdraw a solicitation. They can cancel a solicitation, especially in the face of a protest or something like that. And there's nothing to stop the government from issuing another J&A along the same vein that they had before. Have they issued the solicitation already? Yes, they issued it, withdrew it, and reissued it again last week. And is the solicitation being challenged? Not as of yet, but the closing date for the solicitation is not until the end of the month, this month. So it's not clear whether it's going to be challenged and it's not clear. It's already been canceled and reissued. It's not clear whether that's going to happen again or whether it's going to be extended. Is it your understanding that the master list, the formulary, so to speak, which now has some 30,000 plus items on it, ceases to exist in October of 2020? That's a pretty complicated question because what happened was when the... Let me ask you simply this way. After 2020, until those specific items are repopulated on the list as a result of competitive bidding or whatever, will orders be placed against those existing items? Right. My understanding is that they'd have to reissue, start from scratch with a new formulary. But I just want to point out that I looked at the formulary list. Well, maybe the government probably knows the answer to this better than you, right? Probably, probably does. I mean, the issue is that I anticipate the fact that when they switch to this new program, that they'd have to start the formulary from scratch. But if you look at the current formulary today, there is some holdover from... What do you mean by the word formulary? So that's the list. So what happens is the government, in the current system that we're challenging right now, the government and the prime vendors essentially get together and decide what products they want on a list that the hospitals can order from. And that list of products is called the formulary. And the prime vendors are the four contract holders? That's correct. And they're the ones who go out and find the subcontractors or find the distributors or find the manufacturers in order to bring those manufacturers to the government with a price, a proposed price, proposed product, and say, we think this should be on the list that the hospitals can order. And the price is discussed between the four primes and the various suppliers and then the government, the VA has a sign off on that price? Correct, yes. But the VA doesn't necessarily have insight into how that price came to be or anything like that. They're just told, the VA's just told a price. They presumably can ask the prime vendor how they got to that price, but there's no requirement in the contracts that the prime vendor disclose anything about how they got to that price. Suppose we were to agree with the Court of Federal Claims and say, okay, because of the public interest factor, there's nothing we can do with respect to this contract, which expires only six months from now. What is your position as to what we should do under those circumstances? There's two issues with that. One, it's our opinion that the decision at the Court of Federal Claims gives the government too much leeway to decide something because they made a blanket statement in a justification that veterans' lives would be harmed or this system is the only way to go when there are obviously other systems to use. But what we were asking for at the Court of Federal Claims is just to keep the status quo. The VA was using a system that was not working perfectly, but as they admitted in the J&A, it wasn't working perfectly because they had management problems and they had problems issuing solicitations and their method of issuing solicitations according to industry was incorrect. And instead of fixing that problem, they went off in a completely different direction. Yeah, but I don't think you're really addressing my question. I'm asking you to assume hypothetically, and I'm sure you don't like the hypothetical, but that we agree with the Court of Federal Claims that as a matter of the public interest factor, there's nothing that can be done with respect to this contract, which expires in six months. If we take that position hypothetically, what do you want us to do? I would want the court to essentially rule that this kind of action by the government, even though because there's six months left, maybe the court is constrained, that these kind of actions by the VA are not within the public interest when you look at the whole runway of a J&A that's for the future. But if we say that and not in the public interest, aren't we upset at the ruling by Judge Brugge? I think what he's essentially asking you is whether you are asking us to impose any injunctive relief on the government, assuming we affirm Judge Brugge's decision. Yes. I mean, for example, are you saying that we should write an opinion in which we say whatever happens after 2020, the government is required to comply with all laws in connection with any formulary it may try to propose in the future? That's correct, and that's what we would be seeking, obviously. That's pretty bold, isn't it? I mean, we don't know yet what the government is proposing to do. We haven't heard from the government yet, which I still want to know whether or not the government is going to continue to use the formulary while they take the time competitively to populate 30,000 items. If the record is true from the past, if you want to have 30,000 items on the formulary, it would take the government at least six years to populate it if you use the number that they got on the list using competition before, right? Right, and I would say even now the formulary has… And so where are the hospitals supposed to get their goods for the next six years? I mean, what we would seek is that the VA do what they were doing before in just a more efficient manner, which is running competitions and allowing potential bidders out there, allowing SDVOSBs and other companies to bid on… You mean using the methods required by law that they got 200, 300 items on the list in a nine-month period? They had a little bit more success than that, but they haven't had much success since. It's only about 15,000 items actually. And I understand that when they got the list populated up around 6,000 or something like that, 90% of those had not been done by competition. That's correct, Your Honor. So when they populated the list initially, they were not using competitive methods. They were individually having JNAs one by one, right? Right, but folks had an opportunity to challenge that. They thought that was unlawful in some respect. And there were some competitions as well, but going back to… But that was the whole problem with the delay was whether it was Kingdomware or whatever, if you're trying to populate this list one item or a group of items at a time, subject to a protest, it slows everything down, right? That's correct, and what industry said is group some products together to put them on the formulary together. We want you to bid products together. That's a lot more of an efficient manner, but all these management challenges or challenges that they had were… How did the four primes manage to get 30,000 items on inside of two or three months? Because they didn't have the laws stopping them. They didn't have the competition in contracting. No, but did they just simply take a product list from a group of people and slap it on? A few things happened. One, the VA went to the prime vendors and provided them information about manufacturers and suppliers and things like that. But also, these companies were not constrained by having to run a competition, having to follow the law. That was part of our point. They didn't have to look at the rule of two and decide we have to look at SDVOSBs first, or we don't have to have any kind of competition at all. There's no protest. It's a very efficient system. There's no denying that, but it doesn't make it lawful and it doesn't make it right or in compliance with the Competition and Contracting Act. That was a lot of the issue that we had with it. One thing to think about is that, yes, the court did find that we had success in the merits and found that there was irreparable harm. But the balance of the equities, of course, and the public interest, as we've been discussing it, were weighed in the government's favor. I would posit that there was not a basis in the record to find that. We had moved to supplement the administrative record because when we received the administrative record, there was no evidence that the VA had gone under any deliberative process to determine whether this method was the right method or that the system that they had in place was the wrong system. It's possible the system was the right system. They were just using it incorrectly, which is what— And when the government responded to you that there was nothing else in the record, they admitted that there had been no such studies. Right, and there's been no correspondence. Why did they have to have studies? I think in order for the government to take action, there doesn't necessarily have to be a study. There should be at least one email or one correspondence or one memo to show that they considered what they were doing. Well, they did consider whether or not these four crimes were capable of distributing many, many, many thousands of items in a hurry, right? Distributing, yes, but— I understand that. And so from a point of view of what did the government know, they knew that these four people all said, if you were asking us within a 90-day period to satisfy whether or not there were 60,000 items on the list, we could do it so they could distribute it. Right. And so the government also knew that those four people, because they were already warehousing, right, from lots and lots of suppliers, they knew who a lot of suppliers were. They knew at least some of them, but again, the list was not populated to the VA satisfaction, so obviously there were a lot of suppliers not in the mix that they had no knowledge of, or else that list would have been a lot bigger. And even that document that Your Honor is referring to on page 302, the next page, it says, no distributor will agree to this without data on the supplies to be procured. No one can buy inventory if the items required are also not provided. So even there— That evidence is more supportive of their distribution capacity than their supply capacity, that's for sure. Right. And there's no— Why is it enough if the government says we picked these four people, they're the major distributors, they've been distributing for the whole country, they know the industry, if they are warehousing stuff, they're warehousing it for suppliers, they know who they are, that's good enough for us when we tell them here's 30,000 items we want. Why does the government have to have more in the way of research as to whether or not these four companies will be successful when we know from the track record that they were successful? Because the government was asking them to do a lot more than they were already doing. They had to go out and find a lot of new suppliers, and they had to negotiate pricing with those suppliers and enter into agreements. Even during the TRO phase, one of the basics— Having their previous in the legacy program, weren't they required to negotiate price with suppliers? No. That was between the government and the SDVUSB or contractor. They had to negotiate their distribution fee. Right, but that was fairly well standardized. But they didn't have the capacity to go out and find a lot of new suppliers, which is what the government was asking them to do. They didn't necessarily have that capacity. They may have had it, but the government certainly didn't investigate it, and there's no evidence that they did. Counsel, is it your view— I'm sorry. You have a further question? Yeah, thank you. Is it your view that the Court of Federal Claims here has authority to set rules for follow-on contracts as ancillary to its rule in this case? No, and I don't think—I think that refers to your earlier question, and that's not what I'm asking this court to do or asking the Court of Federal Claims to do. Just a recognition that perhaps the Court of Federal Claims was incorrect in evaluating the public interest, but that because it's later in the game, there's not much that this court can do about it. But I still posit that there is a lot that this court can do about it. All we're asking is that this court reinstate the system that was there and just start running competitions again. All we're asking is the government to run competitions for these products. How can we reinstate the previous system if we find there was no wrong in Judge Brunkie's decision? That might be— And Judge Brunkie's decision covers until April 20. Right. 2020. So I don't understand how we can grant you that relief without reversing it. It may wind up being technically—it may be a finding that as we stand now, there is a public interest in maintaining the system as it is, even if it is unlawful as the court found, as Judge Brugging found, but that back last year, the judge should have found in the other direction. Counsel, your time has expired, but we'll give you two minutes for rebuttal. I appreciate that. Thank you. Let's hear from the government, Mr. Kerr. We're going to take 11 minutes, and then two other parties are going to state their name, rank, and serial number. Two minutes each. May I please support? I'm David Kerr with the Department of Justice. Is it your view that the government has to comply with the law in the new procurements? Absolutely, Your Honor. I mean, the government has to comply with the law. Well, but now your argument is it doesn't have to comply with the law for the last six months here because it would be too disruptive, and I'm just trying to make sure that the government isn't arguing with respect to the new procurements that it would be disruptive to depart from this existing system and that it's necessary to continue to violate the law. The VA is committed to maximizing competition. It's in the VA's interest to maximize competition. Okay, but that's not exactly the response. Well, I'm getting to a better, you know, a full response. And I can confirm that the new prime vendor contracts, there has been a solicitation for them, and that solicitation does not include this modification, this special emergency. What does it include? Is it just distribution? What is this solicitation? Essentially, it goes back to the original intended process where you have the prime vendors doing the distribution and the master list is populated with a variety of measures including blanket purchase agreements. But for the actual contract, it's for the prime contractors? It's for the prime contractors. And it would be just like these prime contractors who are distributors, not suppliers? That's correct. So it just would be are they capable of running distribution facilities to serve the various units around the country? That's correct, yeah. So there's nothing in those? Those are IDIQ contracts? You don't know. So how much do you actually know about those contracts? Well, I looked up to make sure that the solicitation was made on September 27th. I know because that was because the original one was withdrawn abruptly without any explanation at all. And in the meanwhile, the VA has entered into a strategic partnership with the Defense Logistics Agency on this general subject. You're aware of that? Well, I was aware that that was one option they were considering. I didn't know that they actually… They've entered into it. So at least that's what the Internet says. Okay. So we don't know how that's going to affect any of this. So let me just turn to the question of the existing formula. As we speak now, do you know how many items are on it? Yes, there are 60. Ballparks at 2,000? Yeah, approximately 60. Okay. And just to clarify for the court, the original intention was that there be one master list for all four prime vendors. When the VA went with the modification… At what point in time? Are you talking about the legacy program in the very beginning or the NG? The NG program pre-modification. Pre-modification. There was one master list for all four prime vendors. When modification was put into effect, they essentially needed that master list plus one master list for each of the prime vendors because now the prime vendors were proposing supplies only for their jurisdiction. So each one, in a sense, had its own… Well, it carved the country up in four pieces. That's correct. So when we talk about… So after, like today right now, hospitals are ordering goods from the four distributors, right? That's correct, Your Honor. And the goods are going to the hospitals on prices for the goods that were set up under the NG, right? That's correct. Noncompetitively, right? Most of them are not competitive. Okay, so that happens. So until 2020, that will continue. When the end of the contract, that will continue. As of the date when the contracts come to an end, what happens to the formulary? Does it stay in place or is it simply erased overnight? Well, it's not erased overnight. There might be some carryover. For how long? Well, as… If you look at what's in the record at page 123, 124, this is in the JNA, it says in essence that items that go on the formulary by the NG will be there for a period of 24 months, and they'll stay on there until they are replaced one by one or however with competitively awarded functional equivalents. Is that correct? That's correct, Your Honor. Populating the master list or the formulary is an ongoing process. So new items… It hasn't begun yet, right? Well, yes, it has. How do you know that? The VA has issued solicitations for new supplies to be put on the master list. The VA has? Yes. Well, that breaches the contract they have now with the four parties. No, the contract with the four parties, the modified contract… Was not exclusive? It was not exclusive, and it simply provided that the prime vendors would propose sources for supplies. But at least as of 2020, with 60,000 items on the list, there are a bunch of them that were put on by the primes, right? Will stay there until they're taken off by other processes, right? That's correct, Your Honor. How long will it take? Put it this way. Assume I wanted to purge the list. I wanted to go through the 60,000 and pick every single one of them out that was illegally created, which is what Brugge said. How long will it take to purge the list? I don't know, Your Honor. A matter of years? It would be quicker than the – the VA would have better success. But you can't – in order to serve the public interest on behalf of the veterans in the hospitals, you can't simply take it off the list because otherwise the hospital has no place to order. That's correct, Your Honor. I'm confused. Help me here. I saw what Mr. Crusius said, that the contracts with the sub-vendors all expired with the expiration of these master agreements in six months, and that after that there had to be new contracts to acquire these items for the list. Is that correct? That's correct, Your Honor. The prime vendor contracts will expire. The date is March or April 2019. And the sub-vendor contracts expire also? The prime vendors have to contract with the suppliers directly. And presumably those contracts that they've entered into are only for the duration of their own contracts, right? Yeah, I assume that's the case. So if you have a new prime vendor, they'd have to have – Well, how do we know what the term of the contract is? Say a supplier who's supplying Q-tips, and he entered into a contract with one of the primes. How do we know what the terms of that contract are? How do you know? Well, the terms of the contract, the essential terms, are set forth on the master list. Yeah, but the 2020D is a relationship between the VA and the four primes. That's correct. It has nothing to do with the sub-suppliers. Well, that's correct, although it's an assumption that the prime vendors have – What Judge Ike was just saying was an assumption based on what your adversary thought was the case. What I'm confused about is your exchange with Judge Clevenger about the population of the list, which seems to me to be something different than the existence of contracts between the prime vendors and the sub-vendors. Everybody seems to assume that the contracts between the prime vendors and sub-vendors are going to expire at the end of six months when the prime vendor government contracts expire. So are we in a situation where this solicitation that's put out requires these new prime vendors to enter into new contracts with the sub-vendors, which are subject to a different regime? Well, that's correct. The new prime vendors will have to make contracts with the suppliers as it worked under the pre-modification – as it worked under the system all along. Okay, so what does the new solicitation say that that process is going to be and how does it bring it into compliance with the law? Well, the prime vendors have to make a contract with the suppliers based on the amount and the terms from the master list. Explain to us how a hospital is going to get – they want to place an order for needles, right? After April 2020. What happens? Just tell us what's going to happen and under whose contracts will it work? Well, under the new contracts – I don't want to talk about the new contracts. New contracts don't exist yet. Right. So they'll order the needles and the prime vendor of that region and at that time will provide the needles. And they won't – not – how will they – how is the prime vendor going to have in the warehouse the needles? Under whose contract? Well, under the contract with the VA. The prime vendor is warehousing the needles. I understand that. And based on the price from the master list is getting the needles from the supplier. As I understand it, what the prime distributor does is when they see their – they go in their inventory and they see their supply of needles is declining, they call up one of their contracting suppliers and say send us some more. Correct. At which point they have to pay the supplier. Your answer also is that this isn't on appeal. What's on appeal is whether the court erred in finding that the public interest overrode the likelihood that the contract would be found to be invalid. And do you have one – your time is running out. Do you have one final comment on that? Well, the Court of Federal Claims ruled that this temporary solution to fix the supply chain, to give the VA time to make all the corrections that we've been talking about, about the corrections in the proper leadership, the correction in bundling the goods to increase the master list quicker, and the clinical buy-in, all the things that the GAO had mentioned that the VA agrees are necessary, but those are long-term solutions. The VA needed a short-term solution. That short-term solution was the modification. And the Court of Federal Claims decided that the harm of enjoining the VA from using that modification would cause more harm than good. But you make me nervous when you talk about long-term solutions. I guess what I'm interested in is come April, come the new contract, come this new solicitation, are they going to be compliant with the law? They will be compliant. Yes, the VA's new solicitation does not include the modification, does not include that process of putting items on the master list, which the Court of Federal Claims said was violative of the law. It does not include that. So the VA is now that they've had this temporary measure to get back on it. Your best information answer is that you don't know exactly how supplies are going to be distributed to the hospitals in the future. You know that the VA plans to have distributors that probably cover restricted parts of the country. And just like in the olden days, the distributor warehouses the things that the VA feels it needs. And someone has created a set of contractual relationships that provide the warehouse with the supplies. The prime vendor has created that relationship based on what's on the master list. Yeah, but is the prime vendor going to comply with the Rule of Two? The new solicitation, it goes back to the old system, which follows the law, and if it doesn't, there can be another bid protest at that time for that contract. Yeah, but what's the answer to my question? There's a solicitation that was out on the 27th. Does that provide for the prime vendors abiding by the Rule of Two in acquiring these supplies from subvendors? Well, it wouldn't be the prime vendors because the prime vendors are no longer doing that function. It would be the VA, and the VA has to follow the Rule of Two. So the VA is going to contract directly with the suppliers? The VA does. It goes out and it will make a blanket purchase agreement with the suppliers. And in that process, it has to follow the laws, including the Rule of Two. Then the supplier uses that blanket purchase agreement to make its own agreement with the – I'm sorry, the prime vendor uses that agreement to make its own agreement with the supplier for that price and that product, and obviously that supplier. So the VA is negotiating these BPAs, and it has to follow the law in doing so. It has to follow the Rule of Two. I hear you saying is that the VA is going to contract with prime vendors who are going to acquire these supplies from subvendors and that you're going to comply with the law in contracting with the prime vendors, but it's not your business to determine that the prime vendors comply with the law in contracting with the subvendors. And I understand that. No, I'm sorry. I'm not explaining myself very well. The prime vendor contracts are separate from how the master list is populated. So we have the prime vendor contracts that before the modification and now in the new one are just warehousing and distributors, yes. So this case is about how that master list is populated. And in the new system, like the pre-modification system, the VA is going to populate it using existing agreements or new agreements that it negotiates with suppliers. Once it negotiates that agreement with the supplier, it puts the terms of that agreement on the master list, and then the prime vendor has to adhere to those terms. So they're no longer relying on the prime vendor to acquire their supplies. The VA is going to acquire them directly. Correct, yes. That part was in the modification. It's not part of the new system. Thank you, counsel. You've essentially had your full 15 minutes. We have two other parties who have two minutes. Mr. Schreckenberg. Thank you, Your Honor. Thank you, Your Honor. Your Honor, I appreciate the time. I would like to briefly discuss or focus on your question about why we're here today, which is this is an appeal of the harms determination and the weighing of the harms. Plaintiffs succeeded on the merits. Judge Grubing found that the modification was illegal, but he found that the modification was necessary and would be a short-term solution for no more than a maximum of 24 months. You represent one of the primes, right? Yes, I do. Okay. So the contracts that you have with various suppliers, pursuant to which you are loading up your warehouses, right? Yes, Your Honor. Good stuff. And will those contracts come to an end in April 2020?  Yes, Your Honor. The prime vendor contracts with the VA? No, I'm talking about your contracts with the suppliers. You went out with the authority you had as a distributor to go find, in my example, the supplier for needles, and you entered into a contract with the supplier of needles, figured out the price that the needles would per needle cost. The VA presumably approved that price, and you've got those goods in your warehouse, right? Yes, Your Honor. That contract, say, with the Clevenger Needle Company, when does it specify that it comes to an end in April 2020? Your Honor, the ability for the prime vendors to supply. I mean, are you aware of your contracts? Your Honor, the answer is it's not relevant. The answer is the length of those contracts is not relevant because the relationship here is between the prime and the VA. If we don't have a VA contract, then we can't supply that. Let me decide if it's relevant. I apologize, Your Honor. It became relevant when we were asking questions about how long is tainted product going to stick in the inventory, right? And it won't stick beyond April 20. And someone represented that they thought the contracts that you have with your suppliers would terminate in April 20, and I'm asking you the question, is that yes or no? The answer is it likely depends on the contracts, but the prime vendors cannot supply those products to the VA. Yes or no. Are you familiar? You can tell me you're not familiar, and therefore maybe you shouldn't be representing your client, but I'm asking you are you familiar with the details of any single contract that your client has with a supplier? Yes or no? It is not fair of me to ask you these questions if you want to say you don't know the answer. I do not know the details of each of those contracts, Your Honor. However, the prime vendors' contracts with the VA and their ability to supply through this process only runs through April. The VA has already solicited and has on the street 28 separate supply contracts. Those contracts, those solicitations have been out there. They are competitively competed. Let me ask a question this way. April 2020, your relationship, your contract with the VA ends. Yes. Does that mean that you will not fill an order from a hospital after April 2020? We will not have a contract under which to do so, no, Your Honor. You won't be able to fill an order? No, and that is why the relationships with our current subvendors does not pertain to this. The way the VA has reorganized this, there is a new solicitation for distribution for the new prime vendors, and there are 28 separate solicitations already out there complying with the rule of two, seeking new suppliers. Those solicitations have been out. Plaintiffs' clients, to the extent they supply such services, can compete under those solicitations, or if they have a problem with those solicitations, they can protest those solicitations. Thank you, Counsel. Let's hear from this one.  Yes, ma'am. Good morning, Your Honors. May it please the Court? I'm Kristen Iddig for Medline, and I'd be prepared to answer any questions that you have. And it's the same one in terms of your relationship with the VA ends in 2020, right? Correct. And so if a hospital called up in May of 2020 and said, we want you to fill some orders, if you haven't got a new contract, you can't do it. Correct. Unless the contract has been extended or there's some other sort of vehicle, we would not have a way to fill that order. And if we weren't selected as a new contract. If you've got a lot of inventory in your warehouse, you hope you're going to get a new contract, right? Right. But these are commercial companies that the government is doing business with here, and so they have other customers in addition to the government customers. And so if there's a huge supply of needles, there are also commercial hospitals that might need to have those as well. So what you say, unless the contracts are extended, is extension of the prime contracts on the table, an issue on the table? It is not currently on the table, Your Honor, but I suppose it's possible that if the new solicitation for the new prime vendor distributor contracts and for the new 28 supply contracts that Mr. Schneckerberg referenced, if that is not complete, then it is possible. Well, it's almost probable. I mean, if you come to April 2020, it's sort of like a continuing resolution to give us money to run our court. The hospitals have to get the needles. They have to get the Q-tips. Right. The VA has, I think, taken Judge Bruegging's admonitions to heart and is working quickly to put the new solicitation on the street. They issued the draft some time ago, and the process is well under way. It was pulled back in August, wasn't it? Pulled back in July or August? I believe it was first issued in June with proposals due in July. It was pulled back based on errors in the solicitation and then reissued at the end of September. And my understanding is that the intention is to issue the contracts by the end of the year so that they're well within. As far as your client is concerned, that's a pure distributorship type of warehousing and distributorship contract? Right. The primary contract is this distribution contract, and that's the one that my client would be a distributor again. And then separately, there are these 28 supply contracts that would be used to populate the formulary. Now, that's being done by VA in its normal contracting methods, correct? Correct. Well, that's 28 RFPs for 60,000 items. Right. That doesn't cover the entire existing formulary, does it? I'm not sure, Your Honor, if it covers the whole formulary. I would think it would because they've grouped it into these 28 groups to say, here are all the optometry items that we need, here are all the surgical items that we need so that they can get these big groups. Part of the problem that they had the last time around was they would put out a solicitation and say, who can provide us with the size 0.1 needle? And everyone would say, I don't want to bid on that. It's just one little thing. Group them together. And so they've grouped them together in these large groups to try to get it populated much more quickly than they could before. Thank you, counsel. Thank you, Your Honor. Thank you. Mr. Kousias has two minutes for rebuttal. Thank you, Your Honor. I just have a couple of quick points. With respect to the current state of the formulary, if you look at the website the VA has, it has an updated formulary right on it. And as of today, for each prime vendor, there's about 20,000 products on the formulary. So it's not quite 60. Maybe if you add them all together. But each hospital only has the ability to order from one prime vendor. Right, but the prime vendors are serving regions, right? Right. So each region has a value. So, I mean, the hospitals in the region have to order from that prime, right? Correct. So 20,000 sounds like that's the total list. That's correct. As far as we're concerned, that's the number of products each hospital has access to. And about 5,000 or 6,000 of those were added free or were not impacted by the J&A. So the J&A only accounts for about 15,000 products per list. So it wasn't the efficient process or it didn't work out the way that they intended. And Your Honor brought up a point with the ECAT system with DLA and VA having an agreement together. I've been following that actually pretty closely. And I thought that was why they withdrew the solicitation originally, but they reissued it. But it seems like they may be carving out some of the visions in the northwest and in Chicago. So I think it's still – the whole point is it's still a work in progress, and I would anticipate that the April 2020 date is probably a date that they want to meet, but it's not necessarily one I wouldn't be surprised at all if this went on for quite a long time. Yeah, that raises the question of is there a concern here that these contracts that are the subject of this action could be extended? Yes, that's a grave concern that we have. Maybe grave is too strong a word, Your Honor, but that's certainly a concern we have. And the extension would be subject to challenge, right? Not necessarily, no. Because – so if the J&A was extended, that would be subject to challenge. If the underlying contracts were extended, not necessarily because they're not – there wouldn't be a partial change. The underlying contract now, is that the supplier contract with the prime, or what are we talking about? The underlying – I'm talking about the contracts between the prime vendors and the government. If they are extended, I don't necessarily think that that's – If they extend the existing contract, the existing contract is the J&A. Right, so the J&A authorizes the modification. Right. So the question is do they extend the contract as modified by the J&A or do they extend the contract as originally issued? Right, that's a good question. We don't know the answer to that, unfortunately. If they extend the contract with the J&A, are you a stop from challenging that by Burge's opinion? Possibly. I wouldn't want to paint myself into a legal corner at this point, but I could see that being an argument that DOJ, the government, would certainly raise. Absolutely, and that's something – that's a hurdle that we'd certainly have to overcome in the process because one of the arguments that the government made at the Court of Federal Claims was that this was not a cardinal change, which the Court of Federal Claims didn't accept that argument in plain language in the decision. And I could see the government making that same argument where we're just extending contracts. They're not changing at all, so they're not challengeable. It's within the scope of our previous contract. Thank you, counsel. Thank you. Case is submitted. Thank you.